# In the United States Court of Federal Claims

**Case No. 09-419T**
**(FILED:  October 28, 2011)**
**TO BE PUBLISHED**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * *  * | Claim for Tax Refund; Internal |
| | Revenue Code, 26 U.S.C. § |
| **MAGMA POWER COMPANY,** * | 6621(d); Interest Netting on |
| | Underpayments and |
| and * | Overpayments; Consolidated |
| * | Group Income Tax Returns; |
| **MIDAMERICAN ENERGY HOLDINGS** * | Statutory Construction; Plain |
| **COMPANY AND SUBSIDIARIES,** * | Meaning of "Same Taxpayer;" |
| *Plaintiffs,* * | Taxpayer/Employee |
| * | Identification Number; |
| v. * | Legislative Intent. |
| * | |
| **THE UNITED STATES OF AMERICA,** * | |
| *Defendant.* * | |
| * | |
| * * * * * * * * * * * * * * * * * * * * * * *  * | |

*Gerald A. Kafka*, with whom were *Rita A. Cavanagh* and *Paul B. Hynes, Jr.*, Washington, D.C., for Plaintiff.

*Allison Ickovic,* with whom were *Robert J. Higgins, Steven I. Frahm*, and *John A. DiCicco*, Department of Justice, Washington, D.C., for Defendant.

*John M. Bergen*, Law Clerk.

*Samuel M. Poole*, Legal Intern.

## <u>OPINION</u>

**BASKIR, Judge.**

Plaintiff, Magma Power Company ("Magma Power") and its parent corporation, MidAmerican Energy Holdings Company and Subsidiaries ("MidAmerican"), seek a partial refund of the interest assessed against Magma Power, then an independent corporate entity, for tax year 1993 as a result of an underpayment of income taxes.

This case requires us to construe the phrase "same taxpayer" in relation to the interest netting rules contained within section 6621(d) of the Internal Revenue Code ("IRC" or "Code").  The parties filed cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  **For the reasons stated below, we conclude that the plaintiffs' interpretation of the statute is correct and that they are entitled to refund of interest in an amount yet to be determined.**

## BACKGROUND

### I.     History of Interest Netting

Generally, interest is payable on tax deficiencies (IRC § 6601) and is allowed on tax overpayments (IRC § 6611).  In accordance with the Code, however, taxpayers pay interest at a higher rate on tax underpayments than the interest they receive from the Internal Revenue Service ("IRS" or "Service") on tax overpayments.  *See* IRC §§ 6621(a)(1) and (a)(2).  The impact of this differential is greater for large corporations.  *Id.* at §§ 6621(a)(1) and (c).  Under Code §§ 6601(f) and 6611 (b)(1), overpayments are credited against any underpayments, thus reducing the amount of interest owed.  However, historically the offset was not allowed once the overpayment had been refunded or once the tax debt had been satisfied.  Thus, the differential interest rate was applied quite often.  The Code now provides some measure of relief for this inequity in the form of "interest netting" under section 6621(d).  However, the reform did not happen overnight.

Congressional efforts to persuade the Treasury Department to implement broad reforms were met with inaction on the part of the Service.  It was unclear whether the lack of affirmative response was due to practical concerns or some other reason.  Consequently, the House Committee on Ways and Means called for the Treasury Secretary to conduct a study, to hold hearings and receive public comments, and to publish a report identifying any limitations to its interest netting procedures.  *See* H.R. Rep. No. 104-506, at 49-50 (1996) (App. B at Tab 41).  In giving its reasons for requiring these steps, the Committee stated:

> Congress has never adopted differential interest rates, or increased the amount of such differential, without at the same time encouraging the IRS to implement comprehensive interest netting procedures.  The Committee is concerned that the IRS has failed to implement comprehensive interest netting procedures and is interested in learning whether the delay stems from technical difficulties or substantive questions about the scope of such interest netting procedures.

*Id.* at 50.  The results of the study were reported to the House Ways and Means Committee and the Senate Finance Committee in April 1997.  REPORT TO THE

DEPARTMENT OF THE TREASURY, OFFICE OF TAX POLICY, CONGRESS ON NETTING OF
INTEREST ON TAX OVERPAYMENTS AND UNDERPAYMENTS (1997) ("Treasury Report");
App. B at Tab 57.

With the study in hand, Congress finally directed the implementation of a global
netting program after nearly a decade spent unsuccessfully prompting the IRS to solve
the problem.  In 1998, the Code was amended by the Internal Revenue Service
Restructuring and Reform Act, Pub. L. No. 105-206, 112 Stat. 685 (1998), which
provides in pertinent part:

> ELIMINATION OF INTEREST ON OVERLAPPING PERIODS OF TAX OVERPAYMENTS
> AND UNDERPAYMENT.  To the extent that, for any period, interest is payable
> under subchapter A [IRC §§ 6601 et seq.] and allowable under
> subchapter B [IRC §§ 6611 et seq.] on equivalent underpayments and
> overpayments by the same taxpayer of tax imposed by this title, the net
> rate of interest under this section on such amounts shall be zero for such
> period.

*Id.* (codified at IRC § 6621(d)).  This legislation was passed in recognition of the
principle that "taxpayers should be charged interest only on the amount they actually
owe, taking into account overpayments and underpayments from all open years."  H.R.
Rep. No. 105-364, pt. 1, at 63-64 (1997); S. Rep. No. 105-174 at 61 (1998).

Prior to the 1998 amendment, corporate taxpayers were entitled to offset the
interest accrued on income tax underpayments by a corresponding amount of interest
due the taxpayer on income tax overpayments; the remaining balance was then subject
to the applicable interest rate.  While it loosely resembled the procedure applied today,
this practice, known as "offsetting," was limited to periods in which the taxpayer's debt
was still outstanding while the refund resulting from overpayment was still due.  *See*
H.R. Rep. No. 105-364, pt. 1, at 63 ("[I]f either the underpayment or overpayment have
**(sic)** been satisfied, the IRS will not typically offset the two amounts, but rather will
assess or credit interest on the full underpayment or overpayment at the underpayment
or overpayment rate.")  As the House Report noted, this practice resulted in the
taxpayer being assessed a net interest charge, with the higher rate applied to
underpayments, even if the amounts of the underpayment and overpayment were the
same.  *Id.*  The disincentive to pay taxes on a timely basis, particularly where the
company anticipates making an overpayment in future years, was an unintended
consequence of the system.  *Id.* at 64.

With the enactment of section 6621(d)(1), however, the taxpayer was able to
retroactively zero out its interest for equivalent overpayments and underpayments
during any period, regardless of whether the underlying amounts had been satisfied.
*Id.*  This is true even when the respective liabilities span several tax years.  *Compare*
Rev. Proc. 94-60, 1994 C.B. 774 (July 1994) (describing the process of "annual

netting") and IRC §§ 6402(a), 6601(f) (describing the process of "offsetting"). Thus, under this new "global netting" procedure only three conditions had to be met: (i) the offsetting sums had to be equivalent; (ii) they had to overlap during the designated tax years; and (iii) they had to be incurred by the same taxpayer.

While the precise relief addressed by the new legislation is not directly implicated by this case, it is important to note that during the mark-up of the statute Congress issued a broad directive:

> In light of past Congressional statements urging the Secretary to eliminate interest differentials in these circumstances, and taking into consideration Congress' belief that the Secretary may do so, the Committee continues to expect that the Secretary will implement the most comprehensive interest netting procedures that are consistent with sound administrative practice, *and not only those affected by this provision*.

S. Rep. No. 105-174 at 62 (1998) (emphasis added).  In this case, we consider the proper scope of interest-netting, particularly as it pertains to consolidated tax returns.

## II.   Consolidated Group Tax Returns

The Code permits certain affiliated corporations to pay income taxes as part of a consolidated group, whereby individual companies fall under a common parent corporation which files a single unified income tax return and receives any refund directly on behalf of the group.  Filing taxes in this manner is discretionary and is strictly a convenience.  *See* IRC § 1501 (stating that "An affiliated group of corporations shall ... have the privilege of making a consolidated return with respect to the income tax imposed by Chapter 1 for the taxable year in lieu of separate returns.")  Moreover, the consolidated return is only available for income taxes.  Consolidated group members maintain their corporate identities and file separate returns for other types of taxes, such as employment taxes and excise taxes.  *Id.*

The consolidated group's income tax liability is computed based on the separate income tax liabilities of all of its members with adjustments as appropriate.  Treas. Reg. § 1.1502-11(a).  Ordinarily, parent corporations file consolidated returns for all of their subsidiaries – corporate entities are considered subsidiary corporations if 80 percent of their stock's voting power is owned by the common parent. IRC §1563(a)(1) (2004). In electing to file a consolidated return, both parent and subsidiary corporations consent to be bound by the consolidated return regulations, which make the common parent the "sole agent for each subsidiary in the group, duly authorized to act in its own name in all maters relating to the tax liability for the consolidated return year."  Treas. Reg. § 1.1502-77A(a).

Under the consolidated return rules, the group's income tax liability is allocated on a percentage basis.  IRC § 1552; Treas. Reg. § 1.1502-33(d)(3).  The group elects one of three allocation methods provided in section 1552 of the Code.  IRC § 1552(a)(1)-(3); Treas. Reg. § 1.1502-33(d).  In the event the consolidated group does not make an election, the default method – wherein tax liability is allocable based upon the portion of the consolidated taxable income attributable to each member – is chosen for the group.  IRC § 1552(b).

Notwithstanding the parent's exclusive authority to deal with the IRS on behalf of the subsidiaries, the subsidiary group members remain severally liable for any taxes owed.  Treas. Reg. § 1.1502-6(a).  Likewise, any refund due the group is paid by the IRS to the common parent as the exclusive agent for the members of the consolidated group.  *Id.* at § 1.1502-77A(a).  This requirement, like other rules limiting the roles of the subsidiary members, is "basically procedural in purpose and [was] adopted solely for the convenience and protection of the federal government."  *W. Dealer Mgmt., Inc. v. England ("In re Bob Richards Chrysler-Plymouth Corp.")*, 473 F.2d 262, 265 (9th Cir. 1973); *see also Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449, 452 (8th Cir. 1978) (stating that "[T]his agency relationship is for the convenience and protection of [the] IRS only and does not extend further.")

## III.    Chronology of Plaintiffs' Income Tax Activity

Magma Power is incorporated in Nevada and has its principal place of business in Iowa.  On February 24, 1995, Magma was acquired by CalEnergy Company, Inc. ("CalEnergy").  In all relevant respects Magma Power was the same company both before and after it became affiliated with CalEnergy.  It has conducted the same operations, maintained the same place of business, and kept the same name.  On the tax return immediately preceding the acquisition by CalEnergy, for the tax year ending on December 31, 1993, the IRS assessed Magma Power a deficiency of $9,953,525. The company satisfied the delinquency and paid an additional $9,235,206 in interest in 2000 and 2002.

Since being acquired by Cal Energy, Magma Power has been included on the parent company's consolidated tax returns along with several other subsidiaries. Magma Power continues to pay taxes other than income tax independently. Throughout all relevant periods, Magma Power retained its separate and distinct Employer Identification Number ("EIN"), used by the IRS as a means of specifically identifying the corporate taxpayers within the consolidated group.  For the tax years 1995-1998, the IRS determined that the consolidated group was entitled to refunds resulting from tax overpayments.  The consolidated group overpaid its taxes for four consecutive years.  Accordingly, between August 2004 and October 2005, the IRS refunded the overpaid amount plus interest to the agent of the consolidated group, MidAmerican, which is CalEnergy's successor in interest and a plaintiff in this case. The total interest paid on the overpayments during that time frame is $1,454,657 for tax year 1995, $1,631,006 for 1996, $2,742,680 for 1997, and $44,011 for 1998.

The plaintiffs contend that a substantial portion of the overpayments were generated by an IRS audit and subsequent tax adjustment and were directly attributable to Magma Power. *See* Declaration of Steven R. Evans of MidAmerican, ¶¶ 14-16, 19-20, 22-24, 26-29 (Pl. App. A at Ex. 1); *see also* Def. Br. at 11 n.3. ("Defendant acknowledges that a portion of the Cal Energy consolidated group's overpayments are 'attributable to' the activities of Magma, one of its subsidiaries.") They have further established that overlapping periods of interest extended from the due date of the returns resulting in the consolidated overpayments through the date on which Magma Power satisfied its underpayment liability. *See id.* at ¶¶ 28-29, 48 (and exhibits cited therein). Accordingly, Magma Power sought relief under Code section 6621(d), claiming that it was entitled to a net interest rate of zero on its 1993 tax liability to the extent its 1993 underpayment was equivalent to its share of the consolidated group's overpayments in subsequent tax years. Specifically, Magma Power sought $2,190,234, representing the company's payment of interest on its tax deficiency as well as compensation for additional allowable overpayment interest in the same amount. *Id.* at ¶ 30.

On behalf of its subsidiary, MidAmerican pursued a Claim for Refund and Request for Abatement on May 31, 2007. *Id.* On June 25, 2007, the IRS disallowed the plaintiffs' claim. The stated reasons for disallowing the abatement were that "[s]ection 6621(d) does not allow for the netting of interest between an overpayment of a consolidated group's income tax for one taxable year and an underpayment of a member's income tax for a prior taxable year because the consolidated group and the member are not 'the same taxpayer' for purposes of both the overpayment and the underpayment." *Id.* at 31. The plaintiffs filed an appeal on August 30, 2007 to the IRS Appeals Office; the appeal was denied on April 30, 2009. *Id.* at 32.

## IV.   Summary of U.S. Court of Federal Claims Proceedings

The plaintiffs filed their complaint on June 25, 2009. Since filing the complaint, the plaintiffs have revised their interest figure to $2,267,815. After several continuances, the defendant finally answered the complaint on January 22, 2010. Upon filing the Joint Preliminary Status Report, the parties agreed to stay proceedings for a brief period during which they pursued ADR. Soon thereafter, however, the Court held a status conference to address further proceedings in this case. At the conference, it was agreed that this matter was a case of first impression and that its outcome was driven by the question of "same taxpayer" status under a statutory interest netting provision.

The Court directed the parties to proceed with cross-motions for summary judgment. We heard oral argument on May 11, 2011. On June 21, 2001, the government provided the Court notice of superceding authority after the U.S. Court of

Appeals for the Federal Circuit decided a case interpreting section 6621(d).  *See Energy East Corp. v. United States*, 645 F.3d 1358 (Fed. Cir. 2011).  We address this case, along with the other issues raised by the parties' briefs, below.

## DISCUSSION

### I.      Applicable Legal Standards

The Court possesses jurisdiction over suits to obtain a refund of federal taxes pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000).  *See also* 28 U.S.C. § 1346(a)(1) (2000).  As a jurisdictional prerequisite, the taxpayer must have paid the taxes in full and filed a refund claim with the IRS that complied with the pertinent laws and regulations.  *Shore v. United States*, 9 F.3d 1524, 1526 (Fed. Cir. 1993); 26 U.S.C. § 7422(a) (2000).  The defendant has not challenged jurisdiction in this case, nor has it moved to dismiss the case, although the defendant indirectly relies upon the sovereign immunity principle in support of its construction of the statutory provision in question.

Recognizing that the plaintiffs have exhausted all of the avenues available to them before the IRS, our review of the matter is *de novo*.  *George E. Warren Corp. v. United States*, 141 F.Supp. 935, 940 (Ct. Cl. 1956).  Plaintiffs bear the burden of proving that the tax, or in this case the interest assessed and collected by the IRS, is incorrect.  *Helvering v. Taylor*, 293 U.S. 507, 515 (1935).  Furthermore, they must establish the amounts which they are  entitled to recover.  *United States v. Janis*, 428 U.S. 433, 440 (1976).

The procedural posture of this case requires the Court to resolve cross-motions for summary judgment on the issue of liability alone.  Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 670 (1997).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

As the Consolidated Statement of Uncontroverted Facts ("CSUF") demonstrates, the material facts of this case are not in dispute.  The parties agree that Magma Power was responsible for an underpayment of deficiency interest for tax year 1993 and was at least partially responsible for multiple overpayments of interest generated by the consolidated group returns in 1995 through 1998.  Moreover, there is no debate that during the pertinent tax years the deficits overlapped as required by section 6621(d).  As the following tables illustrate, Magma Power's 1993 tax deficiency and accrued interest persisted throughout the periods in which the MidAmerican consolidated group overpaid the IRS on four consecutive income tax returns beginning in 1995:

| Tax Year | Payment Date | Magma Power Tax Deficiency | Interest Amount |
|----------|--------------|---------------------------|-----------------|
| 1993 | May 23, 2000 | $2,597,000 | $0 |
| 1993 | May 15, 2002 | $7,356,525 | $9,235,206 |
| TOTAL | | $9,953,525 | $9,235,206 |

| Tax Year | Payment Date | MidAmerican Group Tax Overpayment | Interest Amount |
|----------|--------------|-----------------------------------|-----------------|
| 1995 | August 23, 2004 | $19,630 | $9,954 |
| 1995 | October 12, 2005 | $2,600,994 | $1,444,703 |
| TOTAL | | $2,620,624 | $1,454,657 |

| Tax Year | Payment Date | MidAmerican Group Tax Overpayment | Interest Amount |
|----------|--------------|-----------------------------------|-----------------|
| 1996 | August 25, 2004 | $3,917,509 | $1,630,511 |
| 1996 | October 12, 2005 | $20,071 | $495 |
| TOTAL | | $3,937,580 | $1,631,006 |

| Tax Year | Payment Date | MidAmerican Group Tax Overpayment | Interest Amount |
|----------|--------------|-----------------------------------|-----------------|
| 1997 | August 19, 2004 | $1,859,069 | $607,246 |
| 1997 | October 12, 2005 | $5,789,888 | $2,135,434 |
| TOTAL | | $7,648,957 | $2,742,680 |

| Tax Year | Payment Date | MidAmerican Group Tax Overpayment | Interest Amount |
|---|---|---|---|
| 1998 | October 12, 2005 | $147,574 | $44,011 |
| TOTAL | | $147,574 | $44,011 |

*See* CSUF ¶¶ 12, 15, 19, 23, and 26; Def. Br. at 2.

We acknowledge that the actual amounts of the interest overpayments directly attributable to Magma Power – and the methodology used in arriving at those amounts – apparently remain in contention.  Whereas the government was initially willing to stipulate to a hypothetical amount of damages – in the event the Court adopted plaintiff's construction of the statute – the defendant cannot even reach a tentative agreement on possible damages.  Def. Reply at 2; *see e.g.,* CSUF ¶ 14 ("Defendant objects that a substantial portion of MidAmerican's refund was 'attributable to' Magma Power Company.  Defendant disputes [p]laintiffs' methodology and calculation of amounts 'attributable.'").  We note, however, that the defendant has indeed conceded some portion of the consolidated group's overpayment interest was attributable to plaintiff Magma Power.  *See* Declaration of Revenue Agent Frank E. Griggs, IRS, attached to Defendant's Opposition and Reply ("Griggs Decl.").

Although arriving at a different figure than did the plaintiffs, the IRS has not expressly contradicted the factual predicate for Magma Power's refund claim.  Nor does the defendant suggest that the facts necessary to oppose plaintiff's summary judgment motion are unattainable – Agent Griggs refers vaguely to "the absence of critical data," but there is no showing attempted under the Rules.  **See RCFC 56(d) (allowing the trial court to defer ruling on summary judgment, order discovery, or issue other appropriate orders when the party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.")**; Griggs Decl. at ¶ 5.  Rather, the government proffered the evidence only because it was directed to do so by the Court and relies upon the declaration in order to "estimate hypothetical attribution amounts." *Id.*  At most, the government has expressed "reservations" due to the fact that the IRS has no universal methodology for quantifying overpayments attributable to a member of a consolidated group.  Def. Reply at 3.  Even so, based on Agent Griggs' calculations, we can conclude that some established percentage of the group's overpayment was attributable during three of the four relevant tax years.  *Id.*; *see also* Def. Br. at 11 n. 3 ("[A] portion of the Cal Energy consolidated group's overpayments are 'attributable to' the activities of Magma.").

Consequently, if Magma Power is considered the "same taxpayer" with respect to its underpayment for 1993 and with respect to Cal Energy/MidAmerican consolidated

group's overpayments for the 1995 through 1998 period, it qualifies for the benefits derived from "interest-netting." According to the plaintiffs, this would reduce Magma Power's underpayment interest for its 1993 tax deficiency and entitle the company to a refund in excess of $2 million.

According to the plaintiffs, "[r]esolution of the legal issue that is the subject of the parties' cross-motions for summary judgment is not dependent on a precise quantification of the attribution amount." Pl. Opp. at 4 n.2. We defer the issue of quantum for the time being. The sole question for this Court to consider at this time is whether Magma Power is the "same taxpayer" for purposes of the statute when it files its own tax return in one year and in subsequent years files as a subsidiary in a consolidated group return. This is a question of statutory construction and is particularly suited to resolution through motions for summary judgment. *Central States, Southeast and Southwest Pension Fund v. Skyland Leasing Co.* 691 F.Supp. 6, 8 (1987).

## II.      Plain Meaning of "Same Taxpayer"

The starting point in a case of statutory construction is the language of the statute itself. *Duncan v. Walker*, 533 U.S. 167, 172 (2001); *Staples v. United States*, 511 U.S. 600, 605 (1994); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977). As this Court has noted in reviewing section 6621(d), "[w]here the intent is unambiguously expressed by the plain meaning of the statutory text, the Court gives effect to that clear language without rendering any portion of it meaningless." *Energy East Corp. v. United States*, 92 Fed. Cl. 29, 33 (2010) (citing *Sharp v. United States*, 580 F.3d 1234, 1237 (Fed. Cir. 2009)). We begin, therefore, by examining the plain-meaning of the term "same taxpayer" in the following clause.

> To the extent that, for any period, interest is payable ... and allowable  ...
> on equivalent underpayments and overpayments *by the same taxpayer* of
> tax imposed by this title, the net rate of interest under this section on such
> amounts *shall be zero* for such period.

IRC § 6621(d) (emphasis added).

In its brief and at oral argument, the government suggests that the plain meaning is explicit and that it is dispositive in this case. According to the government, the above language contemplates a complete identity between the entities reflected on the tax returns in question, regardless of which specific taxpayers are responsible for underpayments and overpayments. Def. Br. at 5. Furthermore, the defendant argues that the interest netting scheme does not expressly address the relatively common situation in which a corporate taxpayer chooses to file as part of a consolidated group. *Id.* at 12-13. Therefore, the relief afforded by section 6621(d) is unavailable to the taxpayer whose underpayment or overpayment is included in a consolidated return.

-10-

This remains true, apparently, even where it is possible to trace the overpayments to the particular EIN which was responsible for the overlapping underpayment from a prior tax year.  Although an IRS agent has proven capable of determining what portions of the consolidated return overpayments are "hypothetically" attributable to Magma Power, the government contends this factor is not relevant.  *See* Def. Opp. at 2 (addressing Griggs Declaration).

Following the government's reasoning to its natural conclusion, the members of a consolidated group have lost their separate identity or, alternatively, their EINs have been rendered irrelevant for purposes of tax overpayments and underpayments.  However, this position is at odds with the practical application of the consolidated return rules.  Under those rules, the EINs of the individual consolidated group members are obviously not lost in the shuffle.  When the parent files the consolidated group return, it also files a schedule of the various subsidiary members of the group, identified by their unique and exclusive EINs.  The common parent elects among several approved means of allocating tax liabilities among its members in preparing the return. IRC § 1552(a)(1)-(3); *see generally* Pl. Br. at 32-33.  Where there is no agreement otherwise by the parties and the common parent has not specified an allocation method for earnings under section 1552(a), any liabilities (and corresponding overpayments) are allocated among members of the consolidated group under the default method established by section 1552(a)(1), "in accordance with the ratio which that portion of the consolidated taxable income attributable to each member of the group having taxable income bears to the consolidated taxable income."  *Id.*  Notwithstanding any disagreement respecting the proper methodology for attributing overpayments or underpayments among subsidiaries in a consolidated group, there is no dispute that certain identifiable portions of MidAmerican's overpayments are, in fact, allocable to Magma Power's EIN.  *See* Tr. at 51, 55; Griggs Decl. at ¶ 5.

The IRC does not define "same taxpayer," at least not specifically in reference to section 6621(d).  Nor has the IRS defined the term in the minimal implementing guidance issued since the enactment of that provision.  A logical starting point is to look at how the IRS identifies a taxpayer when collecting revenue.  The Code defines "taxpayer" as "any person subject to any internal revenue tax;" the term "person" is "construed to mean and include an individual, a trust, estate, partnership, association, company or corporation."  IRC § 7701(a) (1) and (14).  Furthermore, a taxpayer is identified by a taxpayer identification number ("TIN"); in the case of a corporate taxpayer, the TIN is the corporation's employer identification number ("EIN").  Treas. Reg. § 301.6109-1(a)(1)(ii).  The importance of the  identification number is well documented.  *See* FSA 199924017, 1999 FSA LEXIS 70 at *13 (Mar. 17, 1999) ("The key for identifying a single taxpayer is the taxpayer TIN.  Whenever an overpayment is determined the Service's computer system is programmed to search for accounts of the same taxpayer – one using the same TIN – with unpaid balances against which to credit the overpayment before any balance is refunded.")   Accordingly, there seems no better plain meaning of the term "same taxpayer" than "same taxpayer identification number."

Magma Power's EIN is and has remained at all times during the relevant tax years 95-3694478.  App. 3-5.  According to the defendant, however, the plaintiff's EIN is largely irrelevant for purposes of the overpayments in tax years 1995, 1996, 1997 and 1998 since those overpayments applied to the consolidated group as a whole not to Magma Power individually.  The government has never sufficiently explained how this fact, standing alone, divests Magma Power of the ability to offset the interest owed by the IRS as a result of the company's overpayment in years 1995 through 1998 with the interest Magma Power must pay respecting the 1993 underpayment.

We find that the government's focus on Magma Power's association with the consolidated group obfuscates the central issue of whether the same taxpayer is, in fact, responsible for the interest accrued as a result of the underpayment and the interest due as a result of overpayments.

The consolidated group does not factor directly in our determination of this question.  The group itself is not a "taxpayer" under the Code nor does it have a separate EIN for tax purposes.  *See* FSA 200027026, 2000 FSA LEXIS 57 (Apr. 10, 2000) at *9 ("[a] consolidated group is not a person").  It is well established that "the separate corporations are the taxpayers, and the affiliated group is merely a tax-computing unit, not a taxable unit."  *Swift & Co. v. United States*, 69 Ct. Cl. 171, 191 (1930); *see also Helvering v. Morgan's, Inc.*, 293 U.S. 121, 127 (1934) (describing subsidiaries in consolidated group are "separate taxable units," and consolidated returns merely a means of "unit[ing] them for the purpose of [income] tax computation").  Although the common parent has its own unique EIN – MidAmerican is identified by EIN 94-2213782, for example – the overpayments are not necessarily attributable to the parent.  Indeed, there has been no suggestion in this case that the parent was responsible for the overpayment amounts in question.   Rather the parent simply filed the consolidated return in which Magma Power paid amounts in excess of its tax liability.  For purposes of our plain meaning analysis, we are concerned only with the individual member of that group, as identified by its EIN, which is responsible for equivalent amounts of underpayments and overpayments in separate tax years.

We believe ours to be a relatively straightforward analysis, yet inconsistent IRS legal opinions and a dearth of clear precedent on the impact of consolidated group returns obscure the question.  We next review that history.

### III.    Judicial Treatment of Interest-Netting

First, in interpreting section 6621(d) we do not write on a completely clean slate.  The Court considered the application of the interest-netting provision in *Energy East v. United States*, 92 Fed. Cl. 29 (2010) ("*Energy East I*").

Although the government relied heavily on the *Energy East* decision in support of its construction of the "same taxpayer" requirement, a cursory review of the facts

demonstrates that the case was not truly a "same taxpayer" case.   Energy East was a parent corporation.  It acquired two separate and unrelated companies, California Maine Power ("CMP") and Rochester Gas & Electric ("RG&E"), in 2000 and in 2002, respectively.  Subsequently, Energy East learned that these companies had overpaid their income taxes during each of the tax years from 1995 through 1997.  Energy East had underpaid its own income tax in 1999.  *Id.* at 30.  Both the underpayments and the overpayments of all three entities involved in that matter occurred *prior* to the merger and before any relationship, formal or informal, developed among the companies.  *See id.* at n.7 ("None of the overpayments and underpayments at issue were made while the corporations were members of the same consolidated group.")   Under those circumstances, it was abundantly clear that the three companies were not the same taxpayer for purposes of netting interest on their respective underpayments and overpayments.

In fact, Energy East argued not that it was the same taxpayer as these entirely unrelated companies during the pertinent tax years, but rather that it should nevertheless be entitled to net interest as a result of its current affiliation.  In other words, the plaintiff was advocating an extension of same taxpayer status retroactively based on post-return merger activity.  We view this as more of a policy dispute than a good faith reliance on the statute.

Because the facts are so radically different from those involved in the present case, the trial court opinion in *Energy East I* is of limited practical value to either party.  Nonetheless, we want to acknowledge that irrespective of the distinguishing facts of *Energy East I*, Judge Williams took a different tack in her plain meaning analysis than we do.  As opposed to looking at the method by which the IRS distinguishes between taxpayers, Judge Williams limited her plain meaning determination to the dictionary definition of the term "same" and found as follows:

> Webster's Ninth Collegiate Dictionary defines "same" to mean "being one without addition, change, or discontinuance: identical." (citation omitted).  Under this dictionary definition of "same" which requires that the taxpayer be "identical" "without addition, change, or discontinuance," the Energy East corporation that underpaid its taxes in 1999 is not the "same" taxpayer as either the CMP corporation that overpaid its taxes in 1995, 1996, and 1997, or as the RG&E corporation that overpaid its taxes in 1996 and 1997.  These entities are neither "identical" nor "without addition or change."  Rather, the subsidiaries were changed when their parent corporations were acquired by Energy east in 2000, giving them the ability to form a consolidated group.

*Id.* at 34.

We respectfully disagree with this take on same taxpayer status.  We find the definition to be artificially inflexible, requiring what the government counsel has described, alternatively, as the "complete identity" or "exact DNA identity" between the overpaying and underpaying consolidated groups.  Tr. at 30, 35.  The reality is that the make-up of large corporations – the companies that are most likely to take advantage of interest netting – undergo regular changes from year to year and often during the same tax year, while retaining the same EIN for income tax purposes.  This change is anticipated and is specifically permitted, up to a designated threshold, by the Code's consolidated group rules.  IRC §1563(a)(1) (2004).  Under the same DNA analysis, no consolidated group would ever be considered the same taxpayer however slight its change in membership.

While affirming the trial court's decision, the Court of Appeals neither rejected nor adopted this aspect of the trial court's opinion.  As we indicated above, the definitional aspect of section 6621(d) was really never at issue.  In fact, the panel began its discussion by noting:

> The parties do not dispute that Energy East, CMP, and RG & E were not the "same taxpayer," under any definition, when their respective underpayments and overpayments were made.  Rather, they dispute the point in time at which the party requesting the refund must be the "same taxpayer" to avail itself of interest netting under § 6621(d).

*Energy East Corp. v. United States*, 645 F.3d 1358, 1361 (Fed. Cir. 2011) ("*Energy East II*").  In short, the appellant contended that the identity or relationship merely had to exist when the claim for refund was made, not throughout the tax years in question.  *Id.* at 1361-62.  Thus *Energy East II* simply confirmed the timing aspects of interest-netting, holding that section 6621(d) requires taxpayers to be the same at the point in time when the overpayments and underpayments were made.  *See id.* (applying the last antecedent rule of statutory construction).  No facet of this precedent is inconsistent with our interpretation today of section 6621(d).

## IV.    IRS Guidance

The papers filed by the parties also include several legal opinions issued by the IRS – in the form of either a field service advice ("FSA") or a chief counsel advice ("CCA") memorandum – in situations strikingly similar to the facts at hand.  *See* Pl. Br. at 36-42.  These opinions are, of course, not precedential.   However, we find them very revealing insofar as they demonstrate that even the IRS has had trouble coming to terms with the true import of this Congressional mandate.

First, in 2002 the IRS considered a hypothetical inquiry in which a common parent attempts to net interest accruing from a Year 1 underpayment by Corporation A,

-14-

which had filed a separate tax return, and a Year 2 consolidated return -- including Corporation A, which had since affiliated with the consolidated group -- in which the parent, Corporation B, reported an overpayment.  The IRS advised that this question is unresolved, in part because "it is unclear whether the Year 2 overpayment is attributable to either A, B, or both A and B."  FSA 200212028, 2002 FSA LEXIS 4 (Jan. 16, 2002) at *9.  In sum, this opinion does not aid either party.  Yet it suggests that in the consolidated group context "interest-netting *could* apply, but such a determination would be based on the facts and circumstances of the particular case." *Id.* at *10 (emphasis added).

In a second opinion, the IRS applied this 2002 FSA to an even more attenuated set of facts in which Corporation B is the parent of an affiliated group, which  included Corporation C.  In Year 1, prior to its acquisition, Corporation C had filed a return with an underpayment.  This underpayment was still pending and unresolved in Year 7, when it affiliated with Corporation B's consolidated group.  In Years 8 and 9, the consolidated group had overpayments, which were not refunded until several years later.  The question posed was whether parent Corporation B could net the overpayment interest of the consolidated returns it filed in Years 8 and 9 against interest from subsidiary Corporation C's Year 1 underpayment.  Finding against netting on alternative grounds, the IRS nevertheless determined that Corporation C will be considered the same taxpayer with respect to its Year 1 underpayment and *its share* of the Year 8 and Year 9 overpayments.  CCA 200411003, 2003 IRS CCA LEXIS 40, *8 (Sept. 29, 2003) (emphasis added).  Once again, although perhaps not definitive guidance, this advice is consistent with Magma Power's claim that it is the same taxpayer with respect to its pre-acquisition 1993 underpayment and its allocable share of the post-acquisition consolidated overpayments in 1995 through 1998.  Moreover, the CCA directly refutes the government's present position that the statute never comprehended netting of interest in the consolidated group environment.

However, in 2006 the IRS undermined the reasoning of the 2002 and 2004 opinions when it construed "same taxpayer" status in such a manner that a sole filer, which later joined a consolidated group, was not entitled to net interest against overpayments from a consolidated group's return.  In particular, the IRS opined that:

> Given that a consolidated return is a combined return for multiple corporations, all of which are liable for the associated tax, and any overpayment is not deemed an overpayment of any single member, there does not appear to be a basis to treat a member with a separate underpayment as the same taxpayer responsible for a consolidated overpayment.

CCA 200707002, 2006 IRS CCA LEXIS 77 (Dec. 20, 2006) at *9-10.  Interestingly, the 2006 CCA failed to even address the prior inconsistent opinions.  There is no indication that they have been revoked.  To the contrary, as the plaintiff observed, the Internal Revenue Manual continues to cite the 2002 FSA in the instructions pertaining to

interest netting computations.  Pl. Br. at 42, n.6; Tr. at 45.  Notwithstanding the IRS guidance, the Treasury Department has yet to promulgate regulations clarifying the "same taxpayer" requirement in light of the inconsistencies noted above.

Finally, it is important to note that the IRS has grappled with the consolidated group conundrum in other similar contexts.  For example, the plaintiff argues that the relief it seeks is analogous to the prevailing practice of the IRS respecting overpayments attributable to a consolidated group member in bankruptcy.

Cases predating the statute at issue here established that the parent company filing the consolidated return cannot reap the incidental benefits gained through the insolvency of one of its consolidated group subsidiary members.  In particular, where a consolidated group's overpayment is attributable to a member in bankruptcy, then that specific member is entitled to the refund resulting from the overpayment.  *Capital Bancshares v. FDIC*, 957 F.2d 203, 206-08 (5th Cir. 1992); *see also Bob Richards Chrysler-Plymouth*, 473 F.2d at 265 ("Absent any differing agreement we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.") The holdings of these cases were subsequently codified in IRC section 6402(k).

Admittedly, the bankruptcy scenario is not involved here nor are the public policy justifications supporting that result present in this case.  In fact, these cases do not even implicate interest netting.  Yet they are instructive, if for no other reason than they dispel the notion that the consolidated group somehow affects the liabilities or benefits derived from the taxable income of its members.  More to the point, the corporate taxpayer does not lose its taxpayer identification, or any rights to refund, "simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting." *Bob Richards Chrysler-Plymouth*, 473 F.2d at 264-65.  In this sense, it is logical to find that Magma Power was indeed the same taxpayer for each of the tax returns here.

## V.    Defendant's Alternative Arguments

Courts look no further than the plain meaning of statutory terms unless they are ambiguous.  Notwithstanding the alternative perspectives from the field discussed above, the government's current stance on "same taxpayer" status is firmly rooted in the assumption that a taxpayer filing as part of a consolidated group cannot under any circumstances net interest under section 6621(d).  This position extends well beyond any plain meaning analysis of section 6621(d).  However, we would be remiss if we failed to address the argument in light of its potential impact on the objectives of this long sought legislative reform.

(A.)   _Pass-Through Entity Reference_

The defendant suggests that the legislative history weighs in favor of excluding consolidated tax returns from the interest netting scheme.  In support of this argument, the government points to the following passage in the conference report accompanying the bill:

> Where interest is payable and allowable on an equivalent amount of underpayment and overpayment that is attributable to a taxpayer's interest in a pass-through entity (e.g., a partnership), the conferees intend that the benefits of the provision apply.

H.R. Rep. No. 105-599 at 257 (1998) (Conf. Rep.)  It is the government's position that this explicit reference should be interpreted as the sole exception to the same taxpayer rule.  Def. Br. 13.  The government contends that it is fair to infer that Congress did not comment on section 6621(d) in relation to consolidated groups because the provision was not intended to apply to them.  _Id._; _see_ Tr. at 40 ("Congress did give thought to the different types of corporate organizations out there and I think that it's implicit that it made a special exception or it specifically mentioned [pass-through] entities but it did not mention consolidated group.")

This argument is without merit.  There is no indication as to what prompted the conferees to offer the partnership example.  It is just as likely that the statute was silent concerning corporate tax returns because, unlike partnerships, global interest netting is the norm.  The defendant has not shown why the clause should be read as exclusive as opposed to merely illustrative.  Certainly, the use of the parenthetical "e.g." suggests the latter over the former.  Even more fundamentally, as we describe more fully below, to exclude from this program consolidated returns would have far-reaching and absurd implications for the corporate taxpayer base.

(B.)   _Administrative Burden_

During oral argument, the defendant frequently cited the administrative burden associated with applying the interest netting rules to consolidated group members.  The government contends that allowing the members of the consolidated group to net interest would lead to difficulties in tracing the overpayments to the responsible member and would inevitably result in "family fights" among those subsidiaries.

We view this as a policy argument more appropriately directed at Congress, and _before_--not _after_--the passage of section 6621(d).  Even as a policy argument, the asserted administrative burden is subject to qualification.  First, as the plaintiffs' counsel noted, the burden of accounting for the subsidiary companies' corresponding tax liabilities and refund credits remains with the parent of the consolidated group, not the IRS.  This burden is no different in the context of global netting.  _See_ Treas. Rep. at 24

(Noting that larger corporations are more likely to seek the advantages of global netting because "[a]s a practical matter only those who have multiple-year open examinations are likely even to consider whether the potential savings from global netting are worth the cost of compiling the data and performing the calculations.").

This argument relies on the assumption that accounting burdens will fall upon the IRS.  But it is not clear that the consolidated returns will impose any such burdens.  In any event, the argument is peculiar, especially in light of the fact that the IRC provides for consolidated groups as an administratively convenient means of filing large corporate tax returns.  In almost every tax case that comes before the Court, the IRS faces accounting challenges.  It is the very nature of the Service's mission to assess responsibility and collect revenue based on a cumbersome collection of documents.  There is nothing unique about the administrative demands associated with interest netting.  In fact, the Code's consolidated group rules place the onus on the consolidated group to track and allocate tax liabilities among the individual group members.  *See* IRC §1552 (a) and (b); Treas. Reg. § 1.1502-33(d).

We also find it somewhat curious for the defendant now to claim in court that interest netting among taxpayers in a consolidated group imposes too onerous a burden when it failed to raise this precise issue in Congress prior to passage of the amendment.  After several years of what it deemed inadequate measures employed by the IRS, Congress directed the implementation of the most comprehensive interest netting procedures "consistent with sound administrative practice."  S. Rep. No. 105-174 at 62; *see also* H.R. Rep. No. 104-506 at 50 ("The Committee is concerned that the IRS has failed to implement comprehensive netting procedures and is interested in learning whether the delay stems from technical difficulties or substantive questions about the scope of such interest netting procedures.")  It then gave the IRS Commissioner the opportunity to address the administrative implications of so-called "global netting."  *Id.*  The resulting Treasury Report suggested "restrictions to make global netting administratively feasible," including the requirement that taxpayers be held responsible to provide necessary documentation supporting the offsetting overpayments and underpayments.  Treas. Rep. at 24.  The law was passed and revenue procedures were adopted to advise taxpayers on documentary requirements.  *Id.* at 42 (recommending that the "taxpayer should bear the burden of demonstrating entitlement to any netted interest amount claimed"); Tr. at 13 (claiming plaintiff was told to "do the work in the first instance" and be prepared to turn over their computations).  Administrative inconvenience as a bar to global netting was taken off the table with the enactment of section 6621(d).

## VI.    Nature of Intended Relief

Remedial statutory schemes such as the "interest netting" provision at issue here are liberally construed in order to effect their primary purpose.  *See* 3 NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 57.12 at 33 (5th ed. 1992).  As

revealed in the passages cited by Magma Power, Congress enacted section 6621(d) only after several years of Congressional urging directed at establishing a global interest-netting scheme within the IRS, as opposed to the more limited policies of annual netting and offsetting of only outstanding liabilities.  *See* S. Rep. No. 105-174 at 62 ("In light of past Congressional statements urging the Secretary to eliminate interest differentials in these circumstances ... the Committee continues to expect that the Secretary will implement the most comprehensive interest netting procedures that are consistent with sound administrative practice, and not only those affected by this provision.")  According to the government, the admittedly broad remedial language speaks to one particular aspect of the statute, pertaining to whether both the underpayment and overpayment were required to be open tax periods at the time of interest-netting.  Whereas netting was formerly not retroactively applied, the new statute would permit netting without regard to whether the taxes had already been paid or a refund made for a given year.  *See* Tr. at 38-39.  The sweeping directive does not expand same taxpayer status in the consolidated group context.  The fallacy of the government's argument is exposed by a closer examination of the consolidated tax return system.

As the plaintiffs have observed – and the government has not refuted -- the overwhelming majority of corporate taxpayers file consolidated returns.  The Treasury study itself recognized the practice of global interest netting is generally limited to "larger corporate taxpayers and a few very wealthy individuals" since it is simply not practical for the average taxpayer to accumulate interest over spans of open tax years for the potential savings associated with netting the amounts. Treas. Rep. at 24.  Indeed, the legislative history repeatedly demonstrates that the interest differential was most severe as it applied to large corporate taxpayers, the very same taxpayers that tend to form into consolidated groups for administrative ease.  *See e.g.,* H.R. Rep. No. 105-364, pt. 1, at 64 ("The special rules that increase the interest rate paid on large corporate underpayments and decrease the interest rate received on corporate underpayments in excess of $10,000 do not prevent the application of the zero rate. The bill applies to income taxes and self-employment taxes.") Consequently, were we to read into section 6621(d) the exclusion of consolidated filers, we would effectively disqualify almost the entire corporate taxpayer base, and would exclude from the interest-netting program its primary beneficiaries.

Curiously, the government has not advocated such a sweeping exclusion in the past.  The Treasury study, which was required for the explicit purpose of informing Congress of any "technical difficulties or substantive questions about the scope of such interest netting procedures," was silent on the issue of consolidated groups.  H.R. Rep. No. 104-506, at 50; *see generally* Treas. Rep.  The 44-page report does generally question the policy behind the legislation.  Treas. Rep. at 22-24.  While the report offers "some restrictions to make global netting administratively feasible," it makes no mention of the practical difficulties which the government now raises.  *Id*. at 24, 40-43.  Only in its papers filed in this case has the defendant addressed the impediments to allowing interest netting in the consolidated group context.

Based on the representations of counsel at oral argument – which stand unrebutted – the IRS routinely audits the subsidiary companies, all of whom are listed by taxpayer identification, or EIN, in the consolidated return.  Notwithstanding the practical convenience of dealing with the consolidated group agent in the first instance for purposes of settling an undisputed liability, the IRS would most certainly go after the subsidiary directly if a tax liability is not satisfied by the parent.  For an agency that has proven itself very capable of conducting audits and uncovering tax deficiencies among the corporate taxpayers, there is no reason to assume that overpayments could not be linked to a specific EIN just as easily.

The government's position advocating this exclusion is belied by the contemporaneous IRS field opinions addressed earlier.  While not definitively answering the question presented here, the earlier FSAs certainly acknowledged the possibility that taxpayers in a consolidated group could avail themselves of the interest-netting provisions.   Finally, the plaintiff points out that in the *Energy East* case, the government adopted a litigation posture that is clearly inconsistent with its current position that the remedial scheme was never intended to apply to consolidated groups. In its brief, the United States contended:

> When applied to a corporate taxpayer, the term "same taxpayer" as it appears in § 6621(d), means the same corporation that both incurred an underpayment, and made an overpayment of its tax.  Such a taxpayer is identified by the same employer identification number, which means that the individual members of a consolidated group can only net interest *they* owe, against interest that is allowed to *them*, and not against interest that is allowed to other members of the consolidated group (including the corporate parent.)

Brief of the United States in Support of the Cross-Motion of the United States for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 12; *Energy East v. United States*, 92 Fed. Cl. 29 (2010) (No. 07-812 T) (emphasis in original).

In the present case, government counsel stopped short of advocating a bright-line rule that the existence of a consolidated group on either side of the overpayment-underpayment equation disqualifies netting in every instance.  Tr. at 35.  However, she clearly suggested this to be the case:

> I think Congress was well aware of the problem of large corporations. That is in the legislative history.  But what's missing from the legislative history is any discussion of this applying to consolidated groups.

Tr. at 36.  The plaintiffs could have preserved the ability to net interest, the government contends, by filing separately, as opposed to as part of a consolidated group, in the

later tax years. *Id.* at 37.  This line of reasoning ignores the fact that the consolidated return regulations are aimed at providing administrative convenience to both the taxpayer and the IRS.  Furthermore, the argument conveniently disregards the reality that most corporate tax payers are, in fact, affiliated with these consolidated tax-paying units.

Most importantly, the government's rigid interpretation of the "same taxpayer" requirement would completely undermine Congress' direction to the IRS to "implement the most comprehensive interest netting procedures that are consistent with sound administrative practice," and would frustrate the remedial goal to limit taxpayer obligations to interest only on the amount they actually owe, accounting for overpayments as well as underpayments.  H.R. Rep. No. 105-364, pt. 1, at 63-64 (1997); S. Rep. No. 105-174 at 61-62 (1998).  The Court is not inclined to adopt a construction plainly at variance with the policy of the legislative scheme and the stated purpose of the legislation.  *Trustees of Indiana University v. United States*, 618 F. 2d 736, 739 (Ct. Cl. 1980);  *United States v. Native Village of Unalakleet*, 411 F. 2d 1255 (Ct. Cl. 1969).  Only by interpreting the clause "same taxpayer" to include amounts attributable to a consolidated group member may the Court give effect to the legislative will.

## CONCLUSION

Given the conclusions we have arrived at regarding both the plain meaning and practical import of the term "same taxpayer" in section 6621(d), there is no warrant to rely on legislative history to determine Congressional intent.  If one were to consider the legislative backdrop to the contested provision, however, it would clearly support the plaintiffs' interpretation of the statute.  Certainly, the legislative history of the interest-netting provision reveals no support for the government's categorical exclusion of relief for consolidated group members.

This statutory provision was aimed at eliminating the interest advantage enjoyed by the IRS in the mutual debt circumstance and to create economic parity between overlapping underpayments and overpayments by the same taxpayer.  We, therefore, conclude that this provision must be interpreted in the context of statutory intent and that same taxpayer status is intended to be applied to underpayments and overpayments attributable to a corporate entity with the same EIN, irrespective of intervening merger activity.

Accordingly, 1993 Magma Power, and subsidiary Magma Power from 1995-1998, should be properly considered the same taxpayer to the extent the consolidated group's overpayment can be traced to the company.

In accordance with RCFC 56(d)(2), we **GRANT** the plaintiffs' motion for summary judgment as to liability alone, and we **DENY** the defendant's cross-motion for summary judgment.  **The Court directs the parties to file a Joint Status Report no later than December 15, 2011, proposing further proceedings**.


      **IT IS SO ORDERED.**

 s/ Lawrence M. Baskir  
LAWRENCE M. BASKIR  
Judge
